UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| JENNIFER SORRELLS, | : | Case No. 3:18-cv-167 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Jennifer Sorrells brings this case challenging the Social Security Administration's denial of her applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. She applied for benefits in July 2014, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Benjamin Chaykin concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Chaykin's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since February 2, 2013. She was forty-one years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education. *See id.* §§ 404.1564(b)(4), 416.964(b)(4).[2]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Chaykin that she last worked as a part-time bus driver in February 2011 before she had back surgery. (Doc. #6, *PageID* #69). Unfortunately, the surgery was unsuccessful and she did not return to work. *Id.* at 69. Indeed, her back was worse after surgery.

Plaintiff could not remember when she last saw a neurosurgeon or orthopedic surgeon; she thought it may have been in 2013. *Id.* at 70. She sees a pain specialist, Dr. Ahmed, for her back pain. He gives her injections but they do not work. *Id.* at 71. According to Plaintiff, there is nothing else they can do to help her. *Id.* The last time she tried physical therapy, they discontinued it because they did not want her to make the wrong move and risk being paralyzed. *Id.* at 73.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

2

Dr. Henderson diagnosed Plaintiff with fibromyalgia around 2005. *Id.* at 77. She takes Lyrica and Mobic. *Id.* at 78. Her medications help with, for example, her right-leg spasms and leg lock. *Id.*

She has pain in her ankles, legs knees, hips, low-to-middle back, and shoulders. *Id.* at 73. She also has "regular pains … throughout." *Id.* The pain is worse on the right side of her body than her left side. *Id.* Her pain medication can sometimes lower her pain but she always has it. *Id.* at 74. She has some side effects from her medications, including drowsiness, dry mouth, dizziness, and blurred vision. *Id.*

Plaintiff also has problems with her neck. She saw a surgeon about her neck pain but he did not want to do surgery. *Id.* at 71. "They said I had a bulge or something on there…. And some arthritis and stuff …." *Id.* Her rheumatologist gave her injections in the back of her neck and shoulders. *Id.* He also prescribes medication. *Id.*

Plaintiff's neck problems cause headaches in the back of her head and migraines. *Id.* at 82. Additionally, the pain sometimes travels down to the middle of her back. *Id.* at 83. She cannot turn her head without pain. *Id.* When she drives, she just uses her mirrors rather than moving her head. *Id.*

On her right side, she has a drop foot. *Id.* at 73. Plaintiff has an AFO foot brace that is "supposed to support my foot so I won't fall as much …." *Id.* at 79. If she does not wear the brace, her foot drags and she trips on it. *Id.* at 80. With the brace, she is able to drive but sometimes encounters difficulties, for instance, when braking, "I can push down, and I notice, at times, it'll get jammed on the brake, and I jerk." *Id.* at 80.

Plaintiff has on-and-off problems with her hands. *Id.* at 83. Her right is worse than her left. *Id.* at 83. She explained that sometimes when she is holding on to something, it will just drop. *Id*.

Plaintiff takes medication for her depression and anxiety. *Id.* at 74-75. Unfortunately, they do not help. *Id.* at 75. She saw a counselor at Day-Mont West in 2015. At the time of the hearing, she had just received another referral to see a counselor. *Id.* at 79.

Plaintiff has two children. Her daughter, a student at the University of Toledo, lives in an apartment in Toledo. Plaintiff's twelve-year-old son lives with her daughter. Plaintiff goes back and forth between staying in Dayton—with her father or friends—or Toledo, with her daughter. *Id.* at 66. When Plaintiff is in Toledo, she drives her son to school two or three times a week. *Id.* at 67-68. However, her daughter drives her back and forth between Toledo and Dayton because she cannot drive for that long. *Id.* at 68. If she tried drive by herself, "It would almost feel like my waist is coming detached, [I'd] be in so much pain." *Id*. Further, her right leg would start having muscle spasms and lock up. *Id*. As a passenger, she alternates between laying the seat back and sitting up. *Id*.

On a typical day, Plaintiff takes her son to school, returns home, lays around, and watches TV. *Id.* at 75. When she is home, she is usually in bed. *Id.* at 82. She is not able to sleep during the night and often sleeps on and off throughout the day. *Id.* at 75. She makes microwave dinners. *Id*. She cannot cook at the stove because if she stands for

longer than ten minutes, her pain increases. *Id.* at 76. If she sits for too long, it puts pressure on her hips and she has to lie down to release the pressure. *Id.*

Plaintiff has no hobbies and does not go out much. *Id.* at 78. Although she stays at her friends' houses, she does not "hang[] out" with friends. *Id.* She sometimes goes grocery shopping with her son or daughter. *Id.* at 76. If she goes by herself, she has a hard time remembering what to get. *Id.* at 76-77. She also has difficulty putting heavy items in her cart and taking them out. *Id.* at 77. Because of these difficulties, she only goes by herself when she needs a couple things. *Id.* She used to play basketball but cannot anymore. *Id.* at 78. She can go swimming from time to time but not like she used to. *Id.* Her doctor recommended she go to a pool and walk around in the water. *Id.*

    **B.    Medical Opinions**

        *i.    Thomas W. Henderson, M.D.*

Dr. Henderson completed a basic medical assessment in June 2014. He opined that her health status is poor but stable. *Id.* at 611. He indicated that Plaintiff has swelling in her hands and wrists along with "[d]iffuse tenderness in multiple areas of muscles and joints due to fibromyalgia." *Id.* Turning to functional limitations, Dr. Henderson opined that Plaintiff can stand/walk for less than one hour—total and without interruption—in an eight-hour workday. *Id.* at 612. Likewise, she can sit for less than one hour. She can frequently lift/carry less than five pounds. Her ability to push/pull, bend, handle, and perform repetitive foot movements is markedly limited and her ability to reach is moderately limited. Dr. Henderson concluded that her functional limitations are expected to last twelve or more months. *Id.*

5

####### ii. *Scott D. Shaw, M.D.*

Dr. Shaw, Plaintiff's family-care physician, completed an assessment of her abilities and limitations in September 2014. *Id.* at 623. He diagnosed fibromyalgia and lumbago and indicated Plaintiff had moderate functional limitations. Further, he opined that Plaintiff could stand/walk on a sustained basis for between thirty minutes and two hours; sit for between thirty minutes and two hours; and alternately stand/walk/sit for between thirty minutes and two hours. *Id.* She can use her hands for simple grasping and fine manipulation. She is able to lift less than ten pounds. Plaintiff cannot maintain attention and concentration, sustain an ordinary routine, carry out instructions, or perform activities within a schedule. She is able to remember locations/procedures and interact with the general public. *Id.*

####### iii. *Joseph Edwards, Ph.D., & Courtney Zeune, Psy.D.*

Dr. Edwards reviewed Plaintiff's records in November 2014. *Id.* at 115-26. He found that Plaintiff has three severe impairments—disorders of back; other disorders of the nervous systems, and affective disorders. Additionally, she has two non-severe impairments—dysfunction of major joints and fibromyalgia. *Id.* at 121.

He adopted the previous ALJ's mental residual functional capacity under Acquiescence Ruling 98-4 (Drummond Ruling):

> [Plaintiff] lacks the residual functional capacity to: follow complex or detailed instructions; do other than low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average activity [or] … pressure for production[)], work that is other than routine in nature, or work that is hazardous.

6

*Id.* at 124.

In February 2015, Dr. Zuene reviewed Plaintiff's records and affirmed Dr. Edward's assessment. *Id.* at 143-52.

        iv.       *Leon D. Hughes, M.D., & Esberdado Villanueva, M.D.*

In November 2014, Dr. Hughes reviewed Plaintiff's records. *Id.* at 115-26. Under Ruling 98-4 (Drummond Ruling), Dr. Hughes adopted the previous ALJ's mental residual functional capacity, opining that Plaintiff lacks the residual functional capacity to "(1) lift more than five pounds frequently or fifteen pounds occasionally; (2) do greater than occasional crouching, stair climbing, or stooping; (3) crawl or climb ladders or scaffolds; (4) do work at unprotected heights or around moving machinery; (5) do work involving exposure of the body to significant vibration." *Id.* at 123. He concluded that Plaintiff is not under a disability. *Id.* at 126.

Dr. Villanueva reviewed Plaintiff's records in February 2015 and affirmed Dr. Hughes's assessment. *Id.* at 143-52.

## III.    **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from

7

performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Chaykin to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment since February 2, 2013.

Step 2: She has the severe impairments of osteoarthritis of the knees, fibromyalgia, degenerative disc disease of the cervical spine, lumbar degenerative disc disease with history of right foot drop and mild obesity, dysthymia, and a generalized anxiety disorder.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "sedentary work … subject to the following limitations: (1) no more than occasional lifting or carrying up to 10 pounds; (2) no greater than occasional crouching, stair climbing, or stooping; (3) no crawling or climbing ladders or scaffolds; (4) no more than occasional operation of foot controls with the right lower extremity; (5) no work at unprotected heights or around moving machinery; (6) no work involving exposure of the body to significant vibration; (7) no complex or detailed instructions; and (8) limited to performing low stress work activity ([i.e.], no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous)."

Step 4: She is unable to perform any of her past relevant work.

Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 168-85).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 184.

## V. Discussion

Plaintiff contends that the ALJ erred in evaluating the medical source opinions and medical evidence.  The Commissioner maintains that substantial evidence supports the ALJ's findings.

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and

10

consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

In the present case, ALJ Chaykin found that Dr. Henderson's and Dr. Shaw's opinions were not entitled to great or controlling weight. (Doc. #6, *PageID* #183). Instead, he concluded their opinions were "not entitled to more than minimal weight." *Id.* He provided several reasons. First, their opinions are inconsistent with their own objective and clinical finding, as well as other evidence. (Doc. #6, *PageID* #183); *see* 20 C.F.R. § 404.1527(c)(2), (4). Further, their opinions "ignore the consistent clinical findings of normal ambulation, normal muscle strength, and normal sensation and reflexes." (Doc. #6, *PageID* #183); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Third, the ALJ found Dr. Shaw's opinions on Plaintiff's mental impairments were inconsistent with his own "mini-mental status findings." (Doc. #6, *PageID* #183); *see* 20 C.F.R. § 404.1527(c)(2). Finally, neither source provided any explanation for their opinions other than listing their diagnoses. (Doc. #6, *PageID* #183);

11

*see* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

According to Plaintiff, in weighing the medical evidence, "the ALJ improperly interpreted material substantial medical evidence—including raw medical data—as contrary to [Plaintiff's] treating sources." (Doc. #7, *PageID* #1130). Plaintiff points to Dr. Henderson's impression of an x-ray of her pelvis from June 3, 2014: "X-rays show subchondral sclerosis and joint space narrowing of the hips bilaterally. … Impression: Osteoarthritis of hips bilaterally and instrumentation of LS spine with surgical stabilization." (Doc. #6, *PageID* #921).

ALJ Chaykin acknowledged the x-ray results and Plaintiff's mild degenerative disc disease of the hips. However, when discussing the x-ray, he noted, "the objective findings are *mild* in severity related to the hip …." *Id.* at 173 (emphasis added). The ALJ's "mild" finding is, according to Plaintiff, inconsistent with Dr. Henderson's opinion. Plaintiff insists that it is significant that Dr. Henderson completed the Basic Medical Assessment on the same day the x-ray was taken, suggesting that his opinion was based, at least in part, on the x-ray results and is consistent with those results.

There are several issues with Plaintiff's argument. Dr. Henderson's impression of the x-ray does not indicate the severity of Plaintiff's osteoarthritis. Thus, the ALJ's "mild" assessment is not inconsistent with Dr. Henderson's impression.

Further, although the x-ray was ordered and taken on June 3, 2014, there is no indication that Dr. Henderson considered the results before giving his opinion. Dr. Henderson's opinion does not reference the x-ray results or his impression of the x-ray.

12

He does not indicate that her sitting and standing/walking limitations—or any other limitation—are based on the x-ray of her pelvis. Further, on Dr. Henderson's treatment notes from June 3, 3014, his assessment includes unspecified myalgia and myositis, degeneration of intervertebral disc, and rheumatism—not osteoarthritis of her hips. *Id.* He notes that two x-rays (one of Plaintiff's pelvis and one of her LS spine) were "[o]rdered for 06/03/2014." *Id.* at 907-08. At Plaintiff's next appointment on August 14, 2014, however, Dr. Henderson notes "x-ray results" in the "Chief Complaints" section of his treatment notes. *Id.* at 910. Despite his reference to the results, he did not indicate in his notes that Plaintiff has osteoarthritis of her hips. *Id*. at 910-11. In sum, there is no indication that Dr. Henderson considered the x-ray results when providing his opinion. Thus, Plaintiff's argument that the ALJ improperly interpreted that evidence as inconsistent with Dr. Henderson's opinion lacks merit.

Plaintiff contends that the ALJ erred in relying on the State agency physicians' opinion. In contrast to the minimal weight he assigned Plaintiff's treating physicians' opinion, the ALJ assigned the State agency record-reviewing physicians' opinions great weight. He found that they were well supported and "they take into [account] the objective and clinical findings …." *Id.* at 183. However, the ALJ added limitations to his residual functional capacity assessment to account for the records the State agency physicians did not review.

Plaintiff asserts, "the state agency doctors reviewed almost none of the relevant objective and clinical evidence, and none from after 2014. (Doc. #7, *PageID* #s 1130-

13

31). She insists, "this is significant because the post-2014 evidence includes substantial objective medical data …." *Id.* at 1131. She then provides several examples.

Although Plaintiff is correct that there is additional medical evidence that the State agency physicians did not review, her treating physicians, Dr. Shaw and Dr. Henderson provided their opinions *before* the State agency physicians.[3] Thus, they also did not have the post-2014 medical evidence that Plaintiff relies on.

Importantly, there is "no categorical requirement that [a] non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting SSR 96-6p). In the present case, ALJ Chaykin properly considered evidence submitted after the State agency physicians reviewed Plaintiff's record and accounted for changes in her medical condition. *Id.* at 178-79. For instance, the ALJ added "no more than occasional operation of foot controls with right lower extremity" to account for Plaintiff's use of the AFO brace.

Turning to her specific examples, Plaintiff points to x-rays of her knees from February 2, 2015 and October 21, 2015. She is correct that the State agency physicians did not review those x-rays. However, the ALJ acknowledged them and concluded that Plaintiff had mild-to-moderate osteoarthritis in her knees. (Doc. #6, *PageID* #172). The record supports his finding. In January 2016, Nezam Altorok, M.D., noted, "I reviewed

---

[3] Dr. Henderson provided his opinion on June 3, 3014. (Doc. #6, *PageID* #611-12). Dr. Shaw's opinion is dated September 10, 2014. *Id.* at 623. Dr. Hughes reviewed Plaintiff's records on November 18, 2014 and Dr. Villanueva reviewed her records on February 6, 2014. *Id.* at 126, 151-52.

14

her knee x-rays, she has mild [osteoarthritis]. *Id.* at 849. His diagnosis is consistent with x-rays from June 2014 that revealed "[m]inor osteoarthritis at the bilateral knees." *Id.* at 608. Notably, the State agency physicians did review the 2014 x-rays. *Id.* at 120, 145-56.

Next, Plaintiff directs attention to a September 2015 MRI of her cervical spine. And, although Plaintiff points to several "moderate" findings, she ignores the radiologists' impression: "*Mild* multilevel discogenic changes seen throughout the cervical spine. No compression deformity is seen. No central canal stenosis is identified." *Id.* at 714 (emphasis added). Plaintiff's pain specialist, Nadeem M. Ahmed, M.D., also referred to the MRI results as mild: "The patient had a recent MRI of the cervical spine done, which shows multilevel degenerative disk [sic] disease with disk bulges all the way from C3-C4 to C6-C7 level. These are mild bulges without any obvious neural compromise and there is some foraminal narrowing as well, but there is no nerve root compression or significant spinal cord compression seen on this MRI." *Id.* at 775; *see also id.* at 713-14. Plaintiff is nonetheless correct that the record-reviewing physicians did not review the results of the 2015 MRI. However, the ALJ considered the MRI results, found that degenerative disc disease of the cervical spine was one of Plaintiff's severe impairments, and accounted for it in his residual functional capacity assessment. *Id.* at 171-72, 178-79. Indeed, based on the combined effects of Plaintiff's cervical spine, knee, and fibromyalgia, ALJ Chaykin limited Plaintiff to no more than occasional lifting or carrying up to ten pounds. Accordingly, Plaintiff's argument lacks merit. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)

("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition. It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after [the state agency physician's] assessment ... and took into account any relevant changes in McGrew's condition.").

Further, Plaintiff's assertion that the record-reviewing physicians "reviewed almost none of the relevant objective and clinical evidence, and none from after 2014" suggests that the record "almost" lacks objective and clinical evidence from before 2015. This is troubling given her alleged disability onset date of February 2, 2013. To the extent that she is not suggesting this lack of evidence, she did not identify any pre-2015 objective evidence that the record-reviewing physicians did not consider.

In sum, ALJ Chaykin provided good reasons, supported by substantial evidence, for assigning Dr. Henderson's and Dr. Shaw's opinions little weight. He likewise properly considered the record-reviewing doctors' opinions. Accordingly, Plaintiff's Statement of Errors lacks merit.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The ALJ's non-disability decision be affirmed; and
2. The case be terminated on the Court's docket.

August 15, 2019          *s/Sharon L. Ovington*
                                               Sharon L. Ovington
                                               United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).